## Case No. 1,965.

BROOKS et al. v. The WILLIAM PENN et al.

[2 Hughes, 144;[1] 1 Am. Law Reg. 584.]

Circuit Court, D. South Carolina. March Term, 1853.

SALVAGE—COMPENSATION—APPORTIONMENT AND DISTRIBUTION.

1. The ship William Penn went ashore off Charleston harbor. The steamer Jasper, after remaining by the ship during a night of considerable peril, succeeded in dragging her over the shoal, and did not leave her until she was anchored in deep water. Fifteen per cent. upon the value of the ship, together with costs, allowed to the salvors.

2. Salvage services by steam-vessels encouraged; additional remuneration decreed. The doctrine of The Raikes, 1 Hagg. Adm. 246, affirmed.
[See The C. W. Ring, Case No. 3,525; The Saragossa, Id. 12,335.]

3. The principles upon which the admiralty proceeds in awarding salvage, laid down. The William Beckford, 3 C. Rob. Adm. 355, adopted.
[Cited in The Camanche v. Coast Wrecking Co., 8 Wall. (75 U. S.) 475.]

4. In apportioning salvage among the officers and crew of a steamer, the court regards their responsibilities in their different stations. Equal shares given to the master and pilot.
[Cited in The Pomona, 37 Fed. 816.]

Appeal from district court of the United States for the eastern district of South Carolina.

[In admiralty. Libel by Brooks, Barden, and others, owners of the steam packet Gordon, and by the owners of the steam tug Jasper, against the ship William Penn for salvage. The claim of the owners of the Gordon was disallowed, and that of the owners of the Jasper allowed.]

Yeadon and Macbeth, for libellants.
Petigru and King, for respondents.

WAYNE, Circuit Justice. I concur with my learned brother, Judge Gilchrist, in all

---

[1] [Reported by Hon. Robert W. Hughes, and here reprinted by permission.]

the views expressed by him in this case, except in the amount of salvage which he has given to the libellants. I think it altogether too small under the circumstances, especially so if they are considered in connection with the kind of vessel which rendered the salvage service, and with the manner in which it was done. It was done by an uninsured steamboat, worth more than half the value of the ship saved. Though in doing it, there was no imminent peril of life from the sea to the officers and crew of the steamer, there was a risk of property from the sea, and both of property and life from the manner in which the steamer was necessarily worked to effect the service, which make it a case for a larger remuneration than has been decreed, or than would be given if the ship William Penn had been extricated from her dangerous condition by a wrecker or sailing vessel, with the usual appliances in such cases, of anchors, hawsers, capstan, and windlass. In the case of The Raikes, 1 Hagg. Adm. 246, which was the first instance in England of a salvage service rendered by a steam-packet, Lord Stowell reversed the award of commissioners appointed by the lord warden of the cinque ports to determine differences relating to salvage, and nearly doubled the amount of the award, with all the expenses of the appeal, in favor of the salvors. The Raikes in that case was in a situation of actual apprehension, though not of actual danger, and she had been removed from the sand upon which she had struck by a Deal boat, but as there was still an apprehension of danger, she was towed out of it by a steam-packet, into Ramsgate harbor. In giving his judgment, Lord Stowell says, "I am inclined to give as much encouragement as possible to similar exertions, on account of the great skill and the great power of vessels of this description." I am not aware that the policy of his lordship's conclusion has ever been questioned, but I am that it has been approved by his successors, and that it has the concurrence of admiralty lawyers in our own country. It should be so; for a steamer can reach the locality of a disaster sooner and with more certainty than a sailing vessel can. When she arrives at it, she can take a nearer and better position to give aid, can change it as often as exigencies may require, can give readier assistance in saving life, and is more efficient as to the power which can be applied and as to the time it may take to drag a vessel out of danger from a reef into deep water, than it can be done in any other way. Besides, a steamer used as a packet as the Jasper was, and occasionally only for towing vessels in safe and well-known channels, can get insurance for such employment. But it would have been difficult to get a risk taken upon her as a wrecker at all, if not purposely adapted in her enginery and other appointments for such an occupation. And if, without being so, insurance were sought for a steam-packet to act in a particular case as a wrecker, it is certain that the premium which would be asked would probably be fully equal to any compensation she could get for any salvage service she might render. In this instance, the presidents of two insurance companies in Charleston, accustomed to calculate marine risks, and well enough acquainted with the reef upon which the William Penn was run aground to form a safe judgment of her danger, and the hazard to be run by a steam-packet in the attempt to get her off, declare that they would not have taken a risk at all for such an adventure if any part of the duty was to be done in a night in February; nor under any circumstances for less than a premium of twenty to twenty-five per cent. In such cases, then, the risk must always be run by the owner of the steamer, as it was in this by the owners of the Jasper. Such considerations as have been stated had brought me to the conclusion that marine assistance by steamboats must be encouraged by liberal compensation, and that this is a case in which it ought to be given.

The views which I have expressed of the superior claims of steamers in such cases are coincident with the principles by which salvage is graduated. We do not alter but extend them to cover cases which now occur, but which could not have occurred before steam was applied to navigation; in this way lessening the hazards both of life and property to which navigation must ever be liable. The facts upon which a court exercises its discretion in giving salvage are the value of the property saved, the peril in which it may have been, the risk of the property and persons exposed in doing the service, and the timely interposition of both to rescue life and property from loss. But the principles to which courts are subordinate in graduating salvage compensation are founded in public policy, as that has been disclosed by judicial precedents. They are full and to the purpose. Our own courts have said in several cases that the service is of a highly meritorious character. It consists in saving life and property about to perish at sea, often at the peril of the salvor; the interests of society require that the strongest inducements should be held forth for its performance, and it is a settled principle that it should be liberally rewarded. The reward should be such as not only to afford an ample compensation to the salvor for the risk of life and property, and for labor, privations, and hardships encountered, but so liberal as to furnish a sufficient incentive to similar exertions by others.

Sir William Scott says, in the case of The William Beckford, 3 C. Rob. Adm. 355: "The principles in which a court of admiralty proceeds lead to a liberal remuneration in salvage cases; for they look not merely to the exact quantum of service performed in the case itself, but to the general interests

of the navigation and commerce of the country, which are greatly promoted by exertions of this nature. The fatigue, the anxiety, the determination to encounter danger, if necessary, spirit of adventure, the skill and dexterity which are acquired by the exercise of that spirit, all must be taken into consideration." [Talbot v. Seeman] 1 Cranch [5 U. S.] 1; 3 Kent, Comm.; Abb. Shipp.; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; The Henry Ewbank [Case No. 6,376]; Tyson v. Prior [Id. 14,319]; Bond v. The Cora [Id. 1,621]. In order to apply those principles to the case in hand, I will now show the condition of the William Penn from the time that she took the bottom upon the breaker, until she was rescued from it by the Jasper, and the risks that were run in performing that service. The breaker upon which the ship was aground is known as the Pumpkin Hill of the north breaker. From the point where she struck, as well as I can gather from the evidence, the breaker is nearly north and south of the bar or entrance of the main ship-channel to Charleston. From the point mentioned it is something more or less than a statute mile to the southern termination of the breaker; nowhere less than half a mile broad, having in its length and width not more than from three to nine feet at low water, except in two places, where it is ten feet on the east and west sides of the breaker, both, however, shoaling towards the centre of the breaker to three and seven feet water, and of course having no deeper channel over from either side to the other. This description is corroborated by the charts upon which the pilots rely, whilst it is dangerous in every part for a ship when run upon it; its position and manifestation as a breaker are so well defined at all times of tide that it cannot be considered an obstacle or cause for apprehension in making an approach to the bar to get into the main ship-channel leading to the city.

The ship William Penn, of eight hundred and ten tons burden, was cast ashore on this breaker; her captain says it was not caused by any stress of weather, but from an error in his reckoning. She was boarded by a pilot, Mr. Mullings, just before she struck, but not in time to prevent it by his attempt to wear ship. Capt. Folger exonerates Mullings from all blame. He did what both of them thought most likely to save the ship from going ashore, and the best that could be done, unless she could have been brought to anchor even at hazard of cutting away her masts, until there was a change of wind, or until she could have been towed out of danger. Be that, however, as it may, the ship was heading W. N. W., the wind was N. E., or N. E. by E., fresh, but not a gale, and the pilot says she stopped hard and fast in a few minutes after he boarded her. Every effort was immediately made to relieve the ship. Mullings sent the pilot-boat to Charleston for a dozen men to aid in lightening the ship. They came in the course of the day, and threw some of her ballast out, and started her water, hoping to get her off at high water; and at the next high water, though somewhat lightened, she was as hard and fast as when she first struck at seven in the morning. Mullings directed his messenger, who went to town for aid, to see Mr. Chapman, also a branch pilot, and to tell him to engage a steamer to come down to the Penn. The steam-packet Gordon, commanded by Captain Brooks, and owned by himself and Captain Barden, did go down to the ship in the afternoon, but not under any engagement with Captain Chapman or with the agent of the owners of the ship. She carried with her a new hawser, succeeded in getting it to the ship, but after repeated trials, running into three hours of the night, without starting the ship at all, Captain Brooks relinquished the enterprise and returned to the city. The wind was blowing fresh from the east. The Gordon had to be in her place the next morning, in the city, being in the service of the government, and Captain Brooks thought it would have been dangerous to stay by the ship that night; and her captain says it would have been so. Besides, Captain Brooks did not leave the ship until the tide had been some time on the ebb, which made it certain that no force could have hauled the Penn from the breaker until the high tide of the morning, if it could then be done. Captain Brooks's attempt to aid the Penn with a steam-packet more than twice her cost, and at some risk, too, was meritorious; but as he did not put the ship at all out of her danger, or contribute to it in any way with the Gordon, the claim which he makes for salvage on account of himself and his partner, Capt. Barden, and for the crew of the Gordon, cannot be allowed. The Penn was all of that night chafing and grating upon the sand, as she had been all the day before, from seven o'clock in the morning. There was no alteration of position for the better, or at all, except such as was made by the force of the breakers, always greater upon a receding tide, and most so at low water. "The next morning," Captain Folger says, "commenced with a strong breeze from the northward and eastward, with a very heavy sea. The sea was making a clean breach over the ship, and caused her to thump badly. Towards evening a hundred barrels of rum were started and stove in to lighten the ship still more. After being pumped out, the ship was put under all of her canvas at high water, with the yards braced aback. She was started considerably to the southward and westward, and to the inner side of the shoal, but she hung forward as the tide fell, and was hard and fast as ever. Her position had been changed, but not into deeper water than that from and over which

she had been driven, or than that in the direction in which it became necessary, from her change of position, to get her out of the breakers." In this state of things, Mullings ventures an opinion that the ship might have been got off without the aid of a steamboat. I cannot give any weight to that suggestion, for, besides finding him, after the ship had been moved, sending for another steamer, witnesses, as competent from occupation and knowledge as he can be, declare that by having been moved she was put into a worse position than she had been before. Captain Relyea, of the steamer Charleston, altogether a disinterested witness, says the ship did change her position for the worse; for there was more water to the northward than to the southward of her. Captain Chapman, who was on board of the Gordon the night before, and who acted as pilot when the Jasper rescued the ship, says he found that the ship had changed her position, and had got nearer to where there was shoaler water to carry her through. Her change of position was not for the better, but the position was so changed that it was easier to drag her over to the westward than to draw her back to the eastward. William Reed, a rigger and stevedore, who headed the gang which was taken to the Penn to aid in lighting her, and who has followed the sea for sixteen years, is inclined to Mullings's opinion from two soundings which he made after the ship had been moved to where she took the ground the second time. But whilst he no doubt did his duty well in his proper place, he admits that "he is only somewhat acquainted with the bar," and therefore has not such knowledge as can give any aid to Mullings's opinion or to lessen that of Captains Chapman and Relyea, both of whom say that the ship, by having been forced from where she struck to where she was carried by the morning's manoeuvre, had been put in a worse position.

I must conclude from the evidence that the Penn was in great peril from the time she struck until she was taken off the breakers by the Jasper. In less than two hours she was taken into deep water; she had from three to four feet water in her hold. When examined, it was ascertained that her fore and main topmasts were badly sprung, that the rigging of the foremast was much injured, that she had slewed her forefoot, and was considerably damaged also about the stern. The repair of her injuries cost more than eight thousand dollars. It is scarcely necessary, after such a statement, to give in detail the evidence of the ship's peril from the time that she took the bottom for more than thirty-six hours until the Jasper took her out of it; but it will be as well to do so. Her captain says the ship's situation was dangerous, and that she stood in great need of relief; qualifying it only by saying that no one can say she must have perished without the aid of the Jasper. He, of course, speaks of the time when the Jasper came to her relief. The whole narration of Mullings shows that he thought so, and that she stood in need of immediate assistance from a steamer. He has graduated, too, the compensation of three hundred dollars, received by him for his services, upon his apprehension that they were rendered to a ship in imminent danger. Mr. Vincent says she was in great peril—breakers all around her. Captain Relyea testifies that the Penn was ashore on the eastern side of Pumpkin Hill breaker. She was in as bad a place as a ship could be to be saved. Captain Chapman adds, the William Penn was most certainly in a dangerous position. Mr. Paine, speaking of where she first struck, says the Penn was in a very dangerous position, lying right broadside to the sea. Captain McDonald, a branch pilot, saw the ship on the breaker, was not near enough to see her exact position, being almost five miles off; but from his knowledge of the shoals, saw she was in a dangerous position. He was surprised that she was saved; thinks she could not have been saved without extraordinary exertion; very doubtful if she could have been without the assistance of a steamer, but it may have been possible. Mr. Lea, another branch pilot, considered the William Penn in a very dangerous position, so much so that he would not have gone on board of her that night to save the ship, for it was a very dirty-looking night, and a very heavy sea. All of these witnesses make any comment on the testimony of Captain Nichols unnecessary.

I will now show the manner in which the Jasper performed her services, and the risk which she ran in doing it. It is done not only with a view of showing the dangers encountered by her from the sea and from the steam which it was necessary to put upon her engine, but because it is as good an illustration as can be given of the superiority of steamers in such cases, from the nearer approach which can be made by them to the point of danger, and their power to keep the position it may be necessary for them to take, against adverse winds and currents, in the midst of the breakers. Mr. Lafitte, the agent of the owners of the Gordon and Jasper, having ascertained the unsuccessful result of the attempt made with the Gordon, determined to send the Jasper to her assistance. She was furnished with a strong force, and supplied with provisions and fuel "for two or three days," with orders to stay by the ship as long as there was any hope of saving her, or anything from her, in case of her being wrecked. The Jasper was taken down at a proper time before high water. It gave her captain and pilot an opportunity to reconnoitre the ground, and the ship's position upon it, and to make such preparations as they might suggest for the work which she had to do. Mullings and Captain

Nichols think that the Jasper was not at any time in danger from the breakers. But Mullings's opinion in this as in that, when he said the ship might have been relieved without the aid of a steamer after she had been carried from the outer to the inner side of the shoal, was obviously formed upon the soundings of Davenport, which are no foundation for either conclusion, as he does not say at what time of tide they were made, though they were made on the ebb tide, from the beginning of which until low water the depth changes at least five and a half feet, which brings his soundings within that fluctuation, without in any way establishing the fact that the ship had gained a point from which there was a clearer way into deep water from the breakers. Indeed, that Davenport did not think so is plain, for it was after his soundings had been made that he proposed to Capt. Folger to take the chronometers to the pilot-boat, because "they would get jarred in the ship," and as he innocently thought, salvage would be saved upon them if the ship was saved.

We must look to other witnesses for the real danger encountered by the Jasper while she was dragging the ship out of the breakers, which were on every side of her. These witnesses relied upon, are Captains Hayden and Chapman, William Bedford, the engineer of the Jasper, William P. Lea, a branch pilot, Captain Relyea, of the steamer Charleston, and Mr. Vincent, who was also present. The three first are interested witnesses as salvors. The other three are not so, but they confirm the testimony of the first in their facts and conclusions. It is not a case, therefore, for those allowances which must be made for the testimony of interested witnesses or for the exercise of that caution with which courts receive and scan it. Hayden says he ran the Jasper for the ship, until she was in seven feet water, her draft being five and a half. It was a stormy-looking night, heavy sea, and dark overhead. He had been a mariner for thirty-three years. He considered the Jasper in great risk, more so than he will ever run again to save property. He is acquainted with the shoals. The Jasper's stem was in the breakers. The sea broke and washed through her after gangways, stove in one of the deadlights, and though the pumps were going all the time to keep the water under, she had a foot and a half water in her when she reached town. Did not leave the ship until she was safely anchored in deep water; she was dragged over the shoal. Chapman says the night was dark, the sea was heavy, a good deal of wind, and the sea breaking against the steamboat's stern. If he had owned the boat, from the danger which he saw from the leakage of the steampipe, and the gush of water through the deadlights, he would have let go, and not continued that night to try to save the ship. Bedford, the engineer of the Jasper, "went down to the William Penn with the usual press of steam. When they put their lines out, put on the usual press of steam for towage, twenty inches; finding from the roughness of the sea and the weight of the ship that twenty inches could not bring the engine round, he raised the steam to twenty-eight inches; not being able to get the ship off with that force, was ordered by the captain to put it up to thirty-five inches. The boat was then doing her best. He pushed the boiler as much as he dared do with safety." Lea saw the Jasper at work trying to save the ship; thought her in great danger from the heavy sea and the breakers. Vincent, another disinterested witness, also present, declares that the Jasper was in great danger, that she was in the heaviest breakers. Captain Relyea, of the Charleston, considered the Jasper in great risk, so much so that he would not risk his boat any longer after dark. If the Jasper had not been there, he might have stayed; he would not have stayed to save property. He would not have stayed there that night to save the ship, if there were no lives on board; he would not have deemed it prudent to do so. He said, at the time, as the Jasper was there to save life, he would not remain. The weather was dark, threatened to be worse; it was dark and stormy, spitting rain. Has been much at sea as a mariner; is well acquainted with the coast from Savannah to New York. He has saved many vessels with steamboats. The steamer Jasper was in a very perilous position between two breakers, right and left, when she had hold of the ship. When he left, had no idea that the Jasper could have done more than save the lives of the ship's company; thought she would have gone to pieces. Witness got, by an award of the chamber of commerce, forty per cent. salvage, for saving the Alliance and cargo. Don't think his risk in saving the ship Alliance was so great as in saving the Penn, for when the Alliance was saved he had pretty good summer weather. The Jasper is about the same power as the Charleston, and the Charleston is thought a powerful boat for such purposes.

My object in citing the evidence so particularly is to show that the risk run by the Jasper in rescuing the Penn makes it a case within the principle that encouragement must be given to steamboats for effecting salvage service to vessels in distress and in danger of perishing.

It is admitted, notwithstanding the damages which the William Penn had sustained, that she was worth when placed off the breakers into deep water twenty-three thousand dollars. I might, consistently with adjudicated cases, give a larger remuneration than fifteen per cent. upon that sum, but after the best consideration of the case, and of those principles of public policy which are applicable to it, I shall pronounce a decree for fifteen per cent. in favor of the salvor,

with the costs of appeal, and such as can rightly be taxed for the proceedings in this suit in the district court. In the distribution of the salvage, I have tried to carry out the principle of encouragement by giving to the captain and the engineers of the Jasper, and to the crew, and to the pilot, portions as near as I could ascertain it, founded upon their responsibilities in their different stations. The amounts will appear in the decree. I think it right, also, to state that the evidence relating to the offers of compromise from the owners of the ship has not had any influence upon my judgment. My conclusion shows that I think they were insufficient, and that the salvors were right in seeking a reward in a court of admiralty.

The judgment of the district court is reversed.

---

BROOKS, The A. G. See Case No. 98.

BROOKS, The HELEN E. See Case No. 6,330.

BROOKS, The HENRY C. See Case No. 6,374.

BROOKS, The JOHN. See Case No. 7,335.

BROOKS, The JOHN C. See Case No. 7,336.

BROOKVILLE NAT. BANK (WALZ v.). See Case No. 17,137.